SEALED

ORDERED UNSEALED on 09/11/2026 s/ melindajw

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

UNITED STATES OF AMERICA,

Plaintiff,

v.

MAZIN SALIM ALAWAD,

Defendant.

Case No.: 26mj5191

**COMPLAINT FOR VIOLATION OF**

Title 18, U.S.C., Sec. 1343 - Wire Fraud; Title 18, U.S.C., Secs. 981(a)(1)(C), 982(a)(2) and Title 28, U.S.C., Sec. 2461(c) and Title 21, U.S.C., Sec. 853 - Criminal Forfeiture

**UNDER SEAL**

The undersigned complainant being duly sworn states:

At all times relevant to this Complaint:

**INTRODUCTION**

1. The United States Department of Health and Human Services ("HHS") provided federal funding to states, including the State of California, to help low-income families pay for childcare expenses.

2. In California, four programs provided subsidies to childcare providers servicing income-eligible families: CalWORKs Stage 1, CalWORKs Stage 2 Alternative Payment ("C2AP"), CalWORKs Stage 3 Alternative Payment ("C3AP"), and California Alternative Payment Program ("CAPP").

3. In the Southern District of California, the County of San Diego administered "Stage 1" subsidies, and two community organizations,

Child Development Associates ("CDA") and the Young Men's Christian Association ("YMCA"), administered subsidies through the C2AP, C3AP, and CAPP.

4. Generally, if CDA or YMCA determined that a family was eligible to receive subsidized childcare services and the family's selected childcare provider (i) registered with CDA or YMCA, (ii) had an active license to provide care at an approved facility from the State of California Department of Social Services ("CDSS"), and (iii) submitted monthly attendance records documenting the childcare they provided, CDA and YMCA paid subsidies directly to the childcare provider, via check or direct deposit, for providing childcare to registered income-eligible families.

5. Monthly attendance record forms had "self-certification" and signature sections for both the childcare provider and the parent, both of which began, "I declare under penalty of perjury that the information provided on this attendance record is true and correct[.]" Without a completed and signed attendance record, CDA and YMCA did not issue payment to registered childcare providers.

6. CDA and YMCA used a third-party software company to transmit blank monthly attendance records forms to childcare providers. The attendance record forms included the childcare provider's name, the child's name, the parent's name, and a table for entering the child's "Time In" and "Time Out" on each day of the month.

7. Childcare providers could submit completed attendance record forms to CDA and YMCA in-person, via mail, or through a software application. All submissions resulted in a copy of the completed attendance record being transmitted, over interstate wire communications, to the third-party software company's servers in Oregon.

8. California regulations stated in part, "The licensee shall be present in the home and shall ensure that children in care are supervised at all times. When circumstances require the licensee to be temporarily absent from the home, the licensee shall arrange for a substitute adult to care for and supervise the children during his/her absence. Temporary absences shall not exceed 20 percent of the hours that the facility is providing care per day." Cal. Code Regs. Tit. 22, § 102417(a).

9. Defendant MAZIN SALIM ALAWAD, a resident of the Southern District of California, operated "Alawad, Mazin Family Child Care" at an apartment on Highland Avenue in San Diego, within the Southern District of California. The license, effective May 2, 2022, authorized ALAWAD to provide care for up to eight children at the facility on Highland Avenue.

10. Following an application for a "location change" and "capacity change," Defendant ALAWAD received a license from CDSS to operate "Alawad, Mazin Family Child Care" at an address on Reno Drive in San Diego, within the Southern District of California. The license, effective April 6, 2023, authorized ALAWAD to provide care to up to 14 children at the facility on Reno Drive.

11. Defendant ALAWAD received a license from CDSS to operate "Alawad, Mazin Family Child Care" at a different address on Reno Drive in San Diego, California, effective September 24, 2024. The license authorized ALAWAD to provide care for up to 14 children at the facility on Reno Drive.

**<u>Counts 1-4</u>**

**(Wire Fraud)**

**[18 U.S.C. § 1343]**

12. Paragraphs 1 to 11 are re-alleged and incorporated herein.

13. Beginning on a date unknown, but no later than in or about May 2022, and continuing through at least July 31, 2026, within the Southern District of California and elsewhere, defendant MAZIN SALIM ALAWAD, knowingly and with the intent to defraud, devised, participated in, and executed a material scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and intentional concealment and omission of material facts.

**Manner and Means**

14. The fraudulent scheme and artifice to defraud was operated and was carried out, and to be carried out, in substance, as follows:

15. Defendant ALAWAD applied for and received from CDSS licenses to operate childcare facilities in the Southern District of California.

16. After obtaining licenses from CDSS, defendant ALAWAD registered with CDA and YMCA as the childcare provider for families that received subsidized childcare services.

17. Defendant ALAWAD, using the third-party software, accessed and printed blank monthly attendance records for each child ALAWAD was registered with CDA or YMCA as the childcare provider.

18. Defendant ALAWAD submitted to CDA and YMCA completed attendance records for each child ALAWAD had purportedly provided childcare to in the preceding month, and certified under penalty of perjury the accuracy of the dates and times he provided care to a child.

19. Defendant ALAWAD, to obtain payment from CDA and YMCA, knowingly submitted and caused to be submitted attendance records containing materially false and fraudulent statements, specifically the dates and times he purportedly provided childcare to the children identified in the attendance records, and his false certification under

penalty of perjury that that the information in the attendance records was true and correct.

20. Defendant ALAWAD submitted his attendance records to CDA and YMCA, both of which processed the records through the same third-party software and thereby caused interstate wire communications, specifically the transmittal of the attendance records to the third-party software company's server in Oregon.

21. CDA and YMCA relied on defendant ALAWAD's false and fraudulent statements in the attendance records and remitted payment to ALAWAD based on his materially false and fraudulent representations, promises, and intentional concealment and omission of material facts. In doing so, ALAWAD obtained funds from the United States Government that were intended to pay for childcare actually provided to low-income families.

**Use of the Wires**

22. On or about the dates set forth below, within the Southern District of California and elsewhere, defendant MAZIN SALIM ALAWAD, for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud, knowingly transmitted and caused to be transmitted by wire communications in interstate and foreign commerce, certain writings, signs, signals, and sounds as more particularly described below:

| Count | Approximate Date | Interstate Wire |
|---|---|---|
| 1 | May 1, 2026 | Electronic submission of April 2026 Attendance Record for Child 1 |
| 2 | May 1, 2026 | Electronic submission of April 2026 Attendance Record for Child 2 |
| 3 | July 1, 2026 | Electronic submission of June 2026 Attendance Record for Child 1 |
| 4 | July 1, 2026 | Electronic submission of June 2026 Attendance Record for Child 2 |

All in violation of Title 18, United States Code, Section 1343.

**FORFEITURE ALLEGATIONS**

The allegations set forth in Counts 1 through 4 of this Complaint are realleged and incorporated as a part hereof for purposes of seeking forfeiture of property pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(2), and 982(b), and Title 28, United States Code, Section 2461(c).

Upon conviction of one and more of the offenses in violation of Title 18, United States Code, Section 1343 set forth in Counts 1 through 4 of this Complaint, defendant MAZIN SALIM ALAWAD shall forfeit to the United States of America, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2)(A), and Title 28, United States Code, Section 2461(c) and Title 21, United States Code, Section 853, all property, real and personal, which constitutes or is derived from proceeds of the offenses and all property traceable to such property, and all facilitating property.

If any of the forfeitable property, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the Defendant up to the value of the forfeitable property.

///

All pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2)(B), and Title 28, United States Code, Section 2461(c).

The complainant states that this complaint is based on the attached probable cause statement, which is incorporated herein by reference.

Rae Ocampo, Special Agent
Homeland Security Investigations

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 3rd day of September 2026.

HON. DAVID D. LESHNER
United States Magistrate Judge

STATEMENT OF PROBABLE CAUSE

**A. Training and Experience**

1. I have been employed as a Special Agent with Homeland Security Investigations ("HSI") since December 2022. I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia. I am currently assigned to the HSI Office of the Special Agent in Charge, in San Diego, California, and specifically to the Costa Pacifico Money Laundering Group, which is focused on financial investigations.

2. All dates, times, and amounts herein are approximate

**B. Background of Federally Subsidized Childcare Programs**

3. The United States Department of Health & Human Services provides federal funding to states to help low-income families pay for childcare expenses.

4. In California, there are four programs that provide subsidies to childcare providers servicing income-eligible families: CalWORKs Stage 1, CalWORKs Stage 2 Alternative Payment ("C2AP"), CalWORKs Stage 3 Alternative Payment ("C3AP"), and California Alternative Payment Program ("CAPP"). In San Diego, the County of San Diego administers "Stage 1" subsidies, and two community organizations, Child Development Associates ("CDA") and the Young Men's Christian Association ("YMCA"), administer subsidies through the C2AP, C3AP, and CAPP.

5. Generally, if CDA or YMCA determines that a family is eligible to receive subsidized childcare services and their selected childcare provider registers with CDA or YMCA, has an active license to provide care at an approved facility from the State of California Department of Social Services ("CDSS"), and submits monthly attendance records documenting the childcare they provided, CDA and YMCA pay subsidies

///

directly to the childcare provider, via check or direct deposit, for providing childcare to registered income-eligible families.

6. The monthly attendance record forms have "self-certification" and signature sections for both the childcare provider and the parent, both of which begin "I declare under penalty of perjury that the information provided on this attendance record is true and correct[.]" Without a completed and signed attendance record, CDA and YMCA do not issue payment to registered childcare providers.

7. CDA and YMCA both use a third-party software company to transmit blank monthly attendance records forms to childcare providers. The attendance record forms include the childcare provider's name, the child's name, the parent's name, and a table for entering the child's "Time In" and "Time Out" on each day of the month. A childcare provider can submit completed attendance record forms to CDA and YMCA in-person, via mail, or through a software application; all submissions result in a copy of the completed attendance record being transmitted to the third-party software company's servers in Oregon.

8. California regulations state in part: "The licensee shall be present in the home and shall ensure that children in care are supervised at all times. When circumstances require the licensee to be temporarily absent from the home, the licensee shall arrange for a substitute adult to care for and supervise the children during his/her absence. Temporary absences shall not exceed 20 percent of the hours that the facility is providing care per day." Cal. Code Regs. Tit. 22, § 102417(a).

**C. Investigation Background**

9. Since February 2026, Homeland Security Investigations ("HSI") and IRS-CI have been investigating a scheme in which individuals in the Southern District of California receive licenses to operate childcare

facilities, register as childcare providers to families approved for subsidized childcare, and routinely submit materially false and fraudulent monthly attendance records to obtain subsidy payments. The attendance records are false and fraudulent in that they claim the individual provided care to children on dates and times that no actual childcare could have been provided, either because there were no children at the facility or the licensed provider was not at the facility--and in some instances was not even in the United States at the time of the purported childcare. CDA and YMCA rely on the accuracy of the attendance records when remitting payment to providers for the childcare they purportedly provided to low-income families.

10. Through the investigation, agents identified Defendant MAZIN SALIM ALAWAD as an individual who purported to provide childcare services in San Diego, California, which is in the Southern District of California, since at least 2022.

11. ALAWAD first received a license from CDSS to operate "Alawad, Mazin Family Child Care" at an apartment on Highland Avenue in San Diego effective May 2, 2022. The license authorized ALAWAD to provide care to up to eight children at the facility on Highland Avenue.

12. Defendant ALAWAD submitted to CDSS applications for a "location change" and "capacity change" and received a license from CDSS to operate "Alawad, Mazin Family Child Care" at an address on Reno Drive in San Diego, California effective April 6, 2023. The license authorized ALAWAD to provide care for up to 14 children at the facility on Reno Drive.

13. Defendant ALAWAD submitted to CDSS an application for a "location change" and received a license from CDSS to operate "Alawad, Mazin Family Child Care" at a different address on Reno Drive in San

Diego, California, effective September 24, 2024; the license authorized ALAWAD to provide care for up to 14 children at the facility on Reno Drive. All subsequent references herein to "ALAWAD's facility" or "the facility on Reno Drive" are to the facility that ALAWAD was licensed to provide care at effective September 24, 2024.

14. On five occasions between May 14, 2022, and November 5, 2024, defendant ALAWAD signed forms submitted to CDA acknowledging in part "I understand when I sign anything under penalty of perjury I am declaring the information I have provided or statements I am making are factual, true and correct. Making false statements under penalty of perjury may result in prosecution and punishment under State and/or Federal laws."

15. Since May 2022, defendant ALAWAD has received over $950,000 in payments from San Diego County, YMCA and CDA, including over $380,000 in 2025 alone.

16. Based on my training and experience and knowledge of this investigation, I believe ALAWAD is obtaining these funds by routinely submitting materially false and fraudulent attendance record forms that falsely claim he provided childcare to multiple children on dates when no children were at the facility and, in some instances, when ALAWAD himself was not even at the facility.

**D. ALAWAD Falsely Certified Attendance Records**

17. Based on my investigation, I believe ALAWAD falsely certified attendance records for April 2026 and June 2026.

18. On or about May 1, 2026, ALAWAD submitted 21 attendance records to CDA and seven attendance records to YMCA, and claimed under penalty of perjury to have provided childcare to 28 children in April 2026 between April 15 to April 20. In total, ALAWAD claimed in the attendance records to have provided childcare every day of April 2026. Notably,

ALAWAD's attendance records claimed that he cared for 13 children, including a one-year-old child, a two-year-old child, a three-year-old child, Child 1, Child 2, and eight other children from April 15 to April 17, 2026, and April 20, 2026, with care purportedly provided from approximately 11:30 a.m. to 11:30 p.m. ALAWAD also claimed to have provided care to 15 children, including a one-year-old baby, a two-year-old child, a three-year-old child, a four-year-old child, and 11 other children on April 18, 2026, with care purportedly provided from approximately 8:30 a.m. to 10:30 p.m.

19. On or about July 1, 2026, ALAWAD submitted 19 attendance records to CDA and 5 attendance records to YMCA, and claimed under penalty of perjury to have provided care to 24 children in June 2026. In total, ALAWAD claimed in the attendance records to have provided childcare every day of June 2026. Notably, ALAWAD's attendance records claimed that he cared for at least 12 children, including a one-year-old baby, two-year-old child, Child 1, Child 2, and eight other children from June 25 to June 26, 2026, and on June 30, 2026. ALAWAD also claimed to have provided care to 12 children, including a one-year-old baby, a two-year-old child, a three-year-old child, a four- year-old child, a five-year-old child, and seven other children on June 27, 2026, with care purportedly provided from approximately 8:30 a.m. to 10:45 p.m.

20. Each of the attendance records ALAWAD submitted for the months of April 2026 and June 2026 listed "MAZIN SALIM ALAWAD" as the provider and contained a dated signature under the "Provider Self-Certification" stating in part, "I declare under penalty of perjury that the information provided on this attendance record is true and correct[.]" The only active childcare license defendant ALAWAD had during those months was for "Alawad, Mazin Family Child Care" on Reno Drive in San Diego.

21. ALAWAD submitted the attendance records for April 2026 and June 2026 to CDA and YMCA in the Southern District of California, and he caused the following interstate wires when the attendance records were transmitted to the third-party software company's server in Oregon:

| Approximate Date | Interstate Wire |
|---|---|
| May 1, 2026 | Electronic submission of April 2026 Attendance Record for Child 1 |
| May 1, 2026 | Electronic submission of April 2026 Attendance Record for Child 2 |
| July 1, 2026 | Electronic submission of June 2026 Attendance Record for Child 1 |
| July 1, 2026 | Electronic submission of June 2026 Attendance Record for Child 2 |

**E. Stationary Remote Surveillance of ALAWAD's Facility**

22. The investigation team conducted stationary remote surveillance of ALAWAD's licensed facility on Reno Drive from April 15 to April 20, 2026; from June 25 to July 10, 2026; and from July 21 to July 31, 2026.[1] ALAWAD's facility is a structure that is connected to but located in the rear (i.e., further from the street) of a structure with a different Reno Drive address (hereinafter "adjoining house"). Notably, ALAWAD's facility is accessible from Reno Drive via a chain-link gate that bears the facility's street number, a gate which is separate and approximately 10 yards from the chain-link gate that leads to the front door of the adjoining house.[2]

---

[1] The surveillance recordings do not include every minute of the 32 days; rather, the electronic surveillance recorded only for a duration after detecting motion in the frame, including people or moving vehicles on the sidewalk, street, or driveway of the facility.

[2] Additionally, ALAWAD's facility is also accessible from Reno Drive via a gate on the other side of the adjoining facility; in the surveillance recordings, ALAWAD is typically seen leaving and returning through this gate, not the gate leading to the adjoining house.

23. Of the 32 days captured in the surveillance recordings, children are shown walking toward or away from ALAWAD's facility on just three days. The table below identifies the number of children ALAWAD claimed to provide care to in the attendance records and the number of children observed entering or exiting either ALAWAD's facility or the adjoining house:

| Date [2026] | Children ALAWAD Claimed on Attendance Records | Children Observed near ALAWAD's Facility in Surveillance Recordings |
|---|---|---|
| April 15 | 13 | 4 |
| April 16 | 13 | 4 |
| April 17 | 13 | 6 |
| April 18 | 15 | 1 |
| April 19 | 11 | 4 |
| April 20 | 13 | 2 |
| June 25 | 12 | 4 |
| June 26 | 12 | 6 |
| June 27 | 13 | 4 |
| June 28 | 10 | 4 |
| June 29 | 12 | 4 |
| June 30 | 12 | 2 |
| July 2 | 12 | 4 |
| July 3 | 12 | 4 |
| July 4 | 13 | 4 |
| July 5 | 10 | 3 |
| July 6 | 12 | 4 |
| July 7 | 12 | 4 |
| July 8 | 12 | 4 |
| July 9 | 12 | 4 |
| July 10 | 12 | 0 |
| July 21 | 12 | 5 |
| July 22 | 12 | 5 |
| July 23 | 12 | 5 |
| July 24 | 12 | 5 |
| July 25 | 13 | 4 |
| July 26 | 10 | 5 |
| July 27 | 12 | 5 |
| July 28 | 12 | 6 |
| July 29 | 12 | 6 |
| July 30 | 12 | 5 |

| **Date [2026]** | **Children ALAWAD Claimed on Attendance Records** | **Children Observed near ALAWAD's Facility in Surveillance Recordings** |
|---|---|---|
| July 31 | 12 | 5 |

24. On every day of the surveillance period, ALAWAD claimed in his attendance records to have provided childcare to more children than the number of children that appeared in the surveillance recordings, even including those the appeared to enter or exit the adjoining house to ALWAD's facility.

25. Despite ALAWAD's attendance records claiming he provided childcare to at least 10 children every day of April 2026, the six days of surveillance recordings in April 2026 showed no more than six children at ALAWAD's facility or the adjoining house on any given day.

26. Additionally, the surveillance recordings show ALAWAD exiting the facility and driving away in a vehicle at times he later claimed to provide childcare in his attendance records. For example, surveillance recordings show ALAWAD exiting the facility and driving away in a vehicle on April 15, 2026, at approximately 12:26 p.m. and returning at approximately 5:41 p.m. Surveillance recordings then show ALAWAD again exiting the facility at approximately 5:43 p.m. and returning at approximately 7:26 p.m. Attendance records ALAWAD submitted claimed he provided childcare to a total of 13 children on April 15, including Child 1 and Child 2, at various times between approximately 2:14 p.m. to approximately 11:26 p.m. The surveillance recordings show ALAWAD was not even at the facility for all but two minutes of the first five hours that he was purportedly providing care to children that day.

27. Despite ALAWAD's attendance records claiming he provided childcare to at least 10 children every day of June 2026, the six days

of surveillance recordings in June 2026 showed no more than six children near ALAWAD's facility in a day. Notably, the recordings show ALAWAD exiting the facility and driving away in a vehicle at times he later claimed to provide childcare. For example, surveillance recordings from June 30, 2026, show ALAWAD exiting the facility and driving away in a vehicle at approximately 11:38 a.m., returning at approximately 12:41 p.m. and leaving again approximately 30 seconds later, and returning at approximately 6:46 p.m. Attendance records ALAWAD submitted claimed he provided childcare to a total of 12 children, including Child 1 and Child 2, on June 30 at various times between approximately 7:30 a.m. to approximately 11:14 p.m. The surveillance recordings show ALAWAD was not even at the facility for over 7 hours that he purportedly provided care that day.

28. Similarly, despite ALAWAD's attendance records claiming he provided childcare to at least 10 children every day of July 2026, the 20 days of surveillance recordings in July 2026 showed no more than six children near the facility.

29. Based on the above, I believe ALAWAD submitted materially false and fraudulent attendance records for April 2026 and June 2026 that falsely claimed he provided childcare, including at times surveillance recordings show he was not even at his facility.

**F. CDSS VISITS TO DEFENDANT ALAWAD's FACILITY**

30. During my investigation, I discovered that certain CDSS reports are available through open-source research. According to publicly available reports, a CDSS licensing program analyst conducted inspections of ALAWAD's facility on September 5, 2024, February 3, 2026, and February 17, 2026.

///

**CDSS Visit on September 5, 2024**

31. According to the CDSS facility evaluation report summarizing the "pre-licensing relocation inspection" on September 5, 2024, the CDSS analyst arrived at 7:30 a.m., met with ALAWAD (the only person "[p]resent in the home"), and completed the inspection at 9:45 a.m.

32. On or about October 1, 2024, ALAWAD submitted attendance records claiming to have provided childcare to at least 16 different children on September 5, 2024, with care provided from approximately 10:00 a.m. to 10:00 p.m.

**CDSS Visit on February 3, 2026**

33. According to the CDSS facility evaluation report summarizing the unannounced inspection on February 3, 2026, the CDSS analyst arrived at 2:00 p.m., met with ALAWAD and completed the inspection at 3:45 p.m. According to the report, "there were no children or adults present" during the inspection.

34. Despite there being no children present during the CDSS inspection on February 3, 2026, ALAWAD subsequently submitted attendance records claiming to have provided childcare to at least 13 different children that day and at times overlapping with the inspection. Specifically, ALAWAD claimed in the attendance records to have provided care to one child from 1:34 p.m. to 8:41 p.m.; two children from 2:14 p.m. to 11:06 p.m.; three children from 3:09 p.m. to 9:39 p.m.; three children from 3:13 p.m. to 10:21 p.m.; two children from 3:31 p.m. to 10:09 p.m.; and two children from 3:34 p.m. to 10:31 p.m. Based on the times of care ALAWAD provided on the attendance records, at least 13 children should have been present during the CDSS analyst's visit between 2:00 p.m. and 3:45 p.m. on February 3, 2026.

///

**CDSS Visit on February 17, 2026**

35. According to the CDSS facility evaluation report summarizing the unannounced visit on February 17, 2026, the CDSS analyst began the inspection at 2:30 p.m., met with ALAWAD, and completed the inspection at 4:15 p.m. The report noted "[t]here were no children present when [the analyst] arrived," that four children arrived at 3:30 p.m., and three more children arrived at 3:45 p.m.

36. Despite there being no daycare children in care upon arrival of the CDSS analyst, ALAWAD subsequently submitted attendance records claiming to have provided childcare to at least 13 different children on February 3, 2026. Specifically, ALAWAD claimed in the attendance records to have provided care to one child from 1:24 p.m. to 8:41 p.m.; two children from 2:16 p.m. to 11:14 p.m.; three children from 3:14 p.m. to 9:34 p.m.; three children from 3:24 p.m. to 10:14 p.m.; two children from 3:34 p.m. to 10:34 p.m.; and two children from 3:39 p.m. to 10:04 p.m. Based on the times ALAWAD provided on the attendance records, at least three children should have been present when the CDSS analyst arrived and began her inspection at 2:30, and at least ten children should have been present between the start of the inspection (2:30 p.m.) and the end (4:15 p.m.). As noted above, the CDSS report states there no children present at the start of the inspection, and seven children arrived during the inspection.

37. Based on the above, I believe ALAWAD submitted materially false and fraudulent attendance records for February 2026 that falsely claimed he provided childcare at times no children were at ALAWAD's facility.

///

///

**G. PAYMENTS TO DEFENDANT ALAWAD**

38. After submitting the attendance records for childcare provided in April 2026, including for Child 1 and Child 2, Defendant ALAWAD received direct deposits from CDA and YMCA that totaled $27,758.74 into a bank account in May 2026.

39. After submitting the attendance records for childcare provided in June 2026, including for Child 1 and Child 2, Defendant ALAWAD received direct deposits from CDA and YMCA that totaled $27,565.27 into a bank account in July 2026.

40. Since the beginning of 2026, ALAWAD has received over $180,000 in deposits from CDA and YMCA into his bank account.

**H. ALAWAD'S INTERNATIONAL TRAVEL**

41. Border crossing records show ALAWAD departed the United States on November 10, 2025, and returned to the United States on November 28, 2025. Despite not being in the United States, ALAWAD submitted 22 attendance records to CDA and 3 records to YMCA claiming to have provided care to 25 children (for over 6 hours per day) on every day between November 10, 2025, and November 28, 2025.

42. Based on the border crossing records, I believe ALAWAD submitted materially false and fraudulent attendance records for November 2025 that falsely claimed he provided childcare when he was not in the United States.

**I. CONCLUSION**

43. Based on my training and experience, I believe ALAWAD executed a wire fraud scheme a date unknown but no later than May 2022, and continuing through at least July 31, 2026, in violation of 18 U.S.C. § 1343.